IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER **901-326-2410**, THAT IS STORED AT PREMISES CONTROLLED BY **AT&T, 11760 US Highway 1 Suite 600, North Palm Beach, FL 33408** | Case No. 24-SW-304 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Robert Groves, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **901-326-2410**, that is stored at premises controlled by **AT&T**, a wireless telephone service provider headquartered at **11760 US Highway 1 Suite 600, North Palm Beach, FL 33408**. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **AT&T** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since March 2022. I earned a bachelor's degree in Criminal Justice from Harding University in Searcy, Arkansas in 2007. I am a graduate of the Criminal Investigators Training Program and the ATF Special Agent Basic Training both at the Federal Law

Enforcement Training Center and ATF National Academy in Glynco, GA. Prior to my employment as an ATF Agent, I was an officer with the Jackson Police Department (Tennessee) 2008 to 2022. From 2015 to 2020, I was assigned to the Criminal Investigative Division (CID) where I worked in both General Investigations working on theft and burglary crimes and as part of a 14-person Major Crimes Unit where I worked violent crimes including assaults, robberies, sex crimes, and homicides. I worked on over 60 homicides and was the lead investigator on more than 20 homicides. As part of Major Crimes, I specialized in digital evidence recovery and analysis. I attended 40 hours of Call Detail Record analysis and preformed cellular records analysis on over 100 cases and testified in court as to my findings. I also had over 80 hours of training in Mobile Device Forensics and was certified by Cellebrite, the industry leader in Mobile Forensics, as a Certified Cellebrite Operator, Physical Analyst, and a Certified Mobile Examiner, the capstone certification offered by Cellebrite. I have also had 40 hours of Advanced Mobile Forensics for IOS and Android devices. I am currently working toward certification offered by the National White Collar Crime Center as a Certified Cyber Crime Investigator. The last 2 years at JPD I was promoted to the rank of Sergeant in the Patrol Division where I supervised a patrol shift of 15 officers.

3. Throughout my training as a Special Agent with the ATF, I have completed approximately 320 hours of instruction at the Federal Law Enforcement Training Center in Glynco, Georgia (FLETC). I have completed training at the Federal Law Enforcement Training Center including the Criminal Investigators Training Program and Basic Special Agent Training. During these programs I received a total of twenty-seven weeks of instruction on subjects including firearms and ammunition identification, firearms trafficking, explosives and arson training, physical and electronic surveillance techniques, undercover operations, counterterrorism,

narcotics trafficking and mobile communication device investigations. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. §2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. §2516.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of **21 U.S.C. §841(a)(1), POSSESSION OF A CONTROLLED SUBSTANCE WITH THE INTENT TO DISTRIBUTE; and 21 U.S.C. §846, CONSPIRACY OF POSSESSION OF A CONTROLLED SUBSTANCE WITH INTENT TO DISTRIBUTE;** (hereinafter "**TARGET OFFENSES**") have been committed, are being committed, and will be committed by **CHRISTOPHER BUTTS** (hereinafter "**BUTTS**"). There is also probable cause to search the property described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## PROBABLE CAUSE

6. During June and July of 2023, Special Agents with the ATF Memphis Field Office conducted an investigation into Marvis **HARRIS**—a known Crip gang member and an armed drug and firearm trafficker. Multiple purchases of narcotics, including Fentanyl and Methamphetamine, and illegal weapons were made from **HARRIS** during this time period.

## OVERT ACT OF THE CRIMINAL CONSPIRACY TO DISTRIBUTE NARCOTICS BETWEEN HARRIS AND CHRISTOPHER BUTTS

7. On July 13, 2023, an operation was planned to purchase further evidence from **HARRIS**, and to arrest him following the purchase. **HARRIS** met with an ATF Undercover Agent (UCA) near the intersection of Millbranch Rd and Bender Rd, Memphis, Tennessee—located in the Western District of Tennessee. When **HARRIS** and the UCA met on the side of a Family Dollar at this location, the UCA provided **HARRIS** with ATF pre-recorded funds, and **HARRIS** sold the UCA 50 suspect Fentanyl pills. **HARRIS** stated that he had to call his supplier to bring the 4 ounces of Methamphetamine.

8. **HARRIS** stepped out of the UCA's vehicle and made a phone call. ATF surveillance units observed **HARRIS** on the phone in front of the Family Dollar. A gray Honda Accord backed into a parking space near **HARRIS**, and **HARRIS** entered the back seat. **HARRIS** quickly exited the vehicle, returned to the UCA's vehicle and provided him with the suspected Methamphetamine (field test positive upon return to the ATF field office). At this point, the UCA gave the arrest signal.



*Screenshot of Family Dollar Video Surveillance*

9. As the team attempted to arrest **HARRIS**, **HARRIS** fled on foot and was apprehended after approximately 50 yards.

10. As the arrest teams arrived and activated blue lights, the gray Honda Accord fled the parking lot at a high rate of speed. Memphis Police Department (MPD) officers attempted to conduct a traffic stop on the vehicle, which fled onto the interstate at well over 100 miles per hour. Officers discontinued the stop due to safety concerns.

11. Following his arrest, **HARRIS** was transported to the ATF field office, was advised of his Constitutional rights, knowingly and voluntarily waived his *Miranda* rights, and **HARRIS** was interviewed. During this interview, he made multiple admissions regarding his recent illegal sales of firearms and narcotics. **HARRIS** admitted that he was a convicted felon and acknowledged that he had been selling fentanyl pills and firearms. **HARRIS** stated that he primarily sold cocaine, approximating that he sells a quarter ounce (7 grams) every 2-4 weeks. **HARRIS** stated that he has sold cocaine all his life. **HARRIS** stated that he has various sources

of supply for different types of narcotics as well as firearms. **HARRIS** stated that his source of fentanyl pills goes by the nickname of "Lee" and his methamphetamine sources' first name is Chris.

12. **HARRIS** stated that "Chris" was in the front passenger seat of the Honda sedan that ATF asked **HARRIS** who he met with in the Honda Accord. **HARRIS** stated that he met with "Chris," who was in the front passenger seat of the vehicle, and that "Chris" delivered the methamphetamine during the controlled purchase. **HARRIS** described Chris as approximately 40 years old, black male, light skinned, heavy set and more fat than muscle, mohawk haircut, and tattoos on his arms. During the interview, co-defendant **HARRIS** stated that **HARRIS** knows Chris currently drugs, including cocaine, and also stated that Chris keeps firearms at a residence on College Street near the intersection of South Parkway Blvd.

13. **HARRIS** further stated that Chris lives at approximately the 3rd house from the traffic light on College Street, and the house is yellow. **HARRIS** stated that Chris lives there with his girlfriend, and that there are normally a lot of Vice Lord gang members at the house. **HARRIS** has a lengthy history of firearm use and drug distribution. **HARRIS** stated that several years ago he served time in prison with Chris, and that Chris was incarcerated at that time for Robbery and Aggravated Assault with a Deadly Weapon for shooting a Mexican man. This interview was audio recorded.

14. Following the arrest of **HARRIS**, **HARRIS** consented to a search of his cellular phone. Upon searching the phone, it was found that during the time **HARRIS** would have been calling the distributor he identified as "Chris," **HARRIS** was calling someone saved in his cellular phone as "Big Cris" with phone number 901-326-2410 (SUBJECT PHONE). On July

13, 2023, **HARRIS** communicated with this phone number at 12:48 PM, 12:51 PM, and again at 12:58 PM.

15. **HARRIS** had multiple text exchanges with 901-326-2410 over the past six months. These exchanges included **HARRIS** texting "Finna pull down on you Lil bru for 1. MADD LUV." **HARRIS** also texted "Outside Lil bru MADD" and "Need another G so bal." It is the belief of SA Cogswell that these text messages are indicative of **HARRIS** purchasing narcotics from **BUTTS**. Pulling down to get one is implying purchasing 1, likely an amount of narcotics (ounces or grams). **HARRIS** stating that he is outside implies that he has been to the residence or drug distribution location for **BUTTS**, which strengthens **HARRIS'** statements that he has been to **BUTTS'** drug house on College Street. When **HARRIS** stated that he needs another "G," he is likely requesting another gram of narcotics.

16. ATF put the SUBJECT PHONE number into CashApp, and received the following information:



17. Based on your affiant's law enforcement training and experience, I know "LMG", as seen at the end **BUTTS'** Cash Tag, is a neighborhood gang in Memphis, TN.

18. Based on your affiant's law enforcement training and experience, I also know it is common for narcotics traffickers to utilize CashApp to facilitate drug purchases, commit money-laundering, and to avoid seizure of cash from law enforcement.

19. Based on the preceding information, your affiant believes that there is probable cause to believe that the SUBJECT PHONE was used to facilitate the narcotics transaction on or about July 13, 2023, and that the information about the location of the SUBJECT PHONE would indicate the physical location of the device during the transaction.

20. In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

21. Based on my training and experience, I know that **AT&T** can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as **AT&T** typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

22. Based on my training and experience, I know that wireless providers such as **AT&T** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **AT&T** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

23. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

24. I further request that the Court direct **AT&T** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on **AT&T**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Robert Groves
Digitally signed by Robert Groves
Date: 2024.07.22 16:04:32 -05'00'

Robert M. Groves
Special Agent
ATF

Pursuant to Federal Rule of Criminal Procedure 41(d)(3), the undersigned judicial officer has on this date considered information communicated by [ ] telephone or [ ] other reliable electronic means or [X] both, in reviewing and deciding whether to issue a search warrant. In doing so, this judicial officer has placed the affiant under oath and has confirmed by speaking personally with the affiant on the telephone [X] that the signatures on the search warrant application and affidavit are those of the affiant or [ ] that the affiant has authorized the placement of the affiant's signatures on the application and affidavit, the documents received by the judicial officer are a correct and complete copy of the documents submitted by the affiant, and the information contained in the search warrant application and affidavit are true and correct to the best of the affiant's knowledge.

Subscribed and sworn to before me on July 23, 2024.

_____s/Annie T. Christoff_____
Honorable Annie T. Christoff
United States Magistrate Judge
Western District of Tennessee